UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| Plaintiff, | Civil Action No. __1:23__ -cv- __13046__ |
| **v.** | **FILED UNDER SEAL** |
| **SANOFI,** | |
| **GENZYME CORPORATION,** | |
| **and** | |
| **MAZE THERAPEUTICS, INC.** | |
| Defendants. | |

## COMPLAINT FOR PRELIMINARY INJUNCTION PURSUANT TO FEDERAL TRADE COMMISSION ACT § 13(b)

Plaintiff Federal Trade Commission ("FTC" or "Commission") by its designated attorneys, respectfully requests that this Court enter a preliminary injunction to prevent Defendant Sanofi and its subsidiary, Defendant Genzyme Corporation (together, "Sanofi") from consummating an agreement with Defendant Maze Therapeutics, Inc. ("Maze") while an FTC administrative proceeding to determine the legality of that agreement is pending. Pursuant to a License Agreement by and between Defendant Maze and Defendant Genzyme dated as of April 21, 2023, Sanofi will acquire an exclusive license to Maze's glycogen synthase 1 ("GYS1") products and related technology, including its lead clinical candidate MZE001 (the "Proposed Transaction").

The Commission seeks this relief pursuant to Federal Trade Commission Act § 13(b), 15 U.S.C. § 53(b), to preserve the status quo and prevent harm to competition during the

pendency of the Commission's administrative trial to determine whether the Proposed

Transaction violates the antitrust laws. The Commission initiated the administrative adjudication

on December 11, 2023, because it has reason to believe that the Proposed Transaction would

violate the antitrust laws. Pursuant to FTC regulations, the administrative trial will take place in

2024. The administrative trial will determine the legality of the Proposed Transaction and

provide all parties with a full opportunity to conduct discovery and present testimony and other

evidence regarding the likely competitive effects of the Proposed Transaction.

Absent a preliminary injunction, Defendants can consummate the Proposed Transaction

as soon as December 16, 2023, before the FTC and Defendants have completed the

administrative adjudication.

Allowing the Proposed Transaction to proceed would harm competition and undermine

the Commission's ability to remedy the anticompetitive effects of the Proposed Transaction if it

is ultimately found unlawful after a full administrative trial on the merits and any subsequent

appeals.

## NATURE OF THE CASE

1.      For over a decade, Sanofi has been the monopolist supplier of drugs used to treat

Pompe disease, a rare genetic disorder that causes progressive muscle damage and often leads to

death.  As a monopolist, Sanofi charges an average patient over $750,000 for a course of annual

treatment.

2.      Maze has been developing a treatment for Pompe disease that would be easier and

quicker for patients to consume.  Recognizing that Maze's innovative products risk dislodging its

own dominance, Sanofi is now trying to buy out Maze rather than compete with it.

3.     This is a case about a monopolist seeking to eliminate a nascent threat to its monopoly.

4.     For over a decade, Sanofi has been the only supplier of Food and Drug Administration ("FDA") approved treatments for Pompe disease.  Sanofi's first Pompe treatment, Lumizyme (alglucosidase alfa), won FDA approval in 2010 to treat patients eight years and older with late-onset Pompe disease ("LOPD").  Lumizyme remained the only available Pompe disease treatment until August 2021, when Sanofi launched a second treatment, Nexviazyme (avalglucosidase alfa).  Lumizyme and Nexviazyme are both enzyme replacement therapies ("ERTs"), administered at clinics via biweekly intravenous ("IV") infusions.  Although the FDA approved a two-drug regimen developed by Amicus Therapeutics, Inc. ("Amicus") on September 28, 2023 as a second-line therapy for certain Pompe disease patients who are not improving on their current (*i.e.*, Sanofi) ERT Pompe disease treatment, Sanofi possesses monopoly power in the sale of treatments for Pompe disease.

5.     Maze is developing a GYS1 inhibitor drug to treat Pompe disease called "MZE001."  Unlike Sanofi's Lumizyme and Nexviazyme ERTs, which are administered in biweekly IV infusions lasting several hours, MZE001 is an oral medication taken twice daily—which would significantly reduce the treatment burden for Pompe disease patients.

6.     In April 2021, only one month after Maze first publicly revealed its clinical pipeline, Sanofi ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████  As Maze continued to make progress in its development of MZE001, ███████████████████████ ████████████████████████████████████████████████████████████

████████████████ In doing so, Sanofi concluded that MZE001's greatest commercial value

is ███████████████████████████████████████████████

███████████████████████████ Indeed, if the Proposed Transaction is consummated,

Sanofi plans on ███████████████████████

7.   Because MZE001 promises to offer similar therapeutic efficacy but significantly

reduce patients' treatment burden, Sanofi forecast that if MZE001 is approved ██████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ Sanofi's Senior Director of New Product Planning for Rare Diseases observed

that █████████████████████████████████████

8.   At first, Sanofi attempted to meet this competition by striving to innovate. ████

████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████

9.   Maze's development of MZE001 spurred Sanofi to █████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

4

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████ In February 2022, Maze announced new preclinical data supporting MZE001's advancement and that it was initiating first-in-human trials. Sanofi then realized ████████████████████████████████████ ████████████████████████ A few months later, observing that MZE001 can be administered orally and cognizant of the drug's commercial promise, Sanofi concluded that it had to ██████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████

10.     Maze's series of positive announcements regarding MZE001 made it clear to Sanofi that ████████████████████████████ Sanofi therefore had two options.  The first was to continue to compete on the merits by ██████████████████████████████████████████ ████████████████████████████ The second was to eliminate competition by neutralizing the nascent competitive threat that MZE001 posed.

11.     Sanofi chose the second option. Internally, Sanofi executives made clear that acquiring MZE001 ████████████████████████ would transform MZE001 from a threat into a shield to protect Sanofi's monopoly ██████████████████████████████████████ ███████████████████████████████████████████

12.     In April 2022, Maze executives travelled to Boston to meet with Sanofi personnel to discuss ███████████████████████████████████████████████████ ████████████████████████████ MZE001.  The next month, high level Maze and Sanofi executives met again in Cambridge, Massachusetts, to discuss potential business collaborations relating to MZE001.  In an internal email, Maze's then-Chief Business Officer described the deal structures discussed at the May 2022 meeting: ███████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

13.     By June 2022, Maze ████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████  In July 2022, Sanofi presented financial terms for acquiring an exclusive license to MZE001.  Maze and Sanofi executives continued to negotiate through the fall and winter, with ███████████████████████████████████  These negotiations culminated in a three-day in-person meeting between Maze and Sanofi executives in Cambridge in late March 2023 to finalize the language of the definitive license agreement, which the two companies ultimately executed on April 21, 2023 (the "License Agreement").

14.     For its part, Maze negotiated the License Agreement based on the understanding that ██████████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

16.    15.     The anticompetitive impact of the License Agreement was immediate.  Shortly after the agreement was signed, ██████████████████████████████████████.  For its part, Sanofi ████████████████████████████████████████████ ██████████████████████████████ Although the License Agreement has already lessened competition, if consummated, the Proposed Transaction would forever deprive Pompe disease patients of the benefits of competition between Sanofi and Maze ███████████████████████ ██████████████

16.    Although a small number of other firms have initiated Phase 1 clinical trials for other Pompe disease treatments, Sanofi forecasts that █████████████████████████ ████████████████████████████████████████████ ██████ In fact, Sanofi's internal models of the Proposed Transaction projected that MZE001 in a rival's hands could capture as much as ████████████████████████████████ ████████████████████████████

17.     The Proposed Transaction would eliminate the nascent threat MZE001 poses and, therefore, constitutes conduct that is reasonably capable of contributing significantly to Sanofi's continued monopoly power in treatments for Pompe disease, which violates Section 2 of the Sherman Act, and thus constitute an unfair method of competition in violation of Section 5(a) of the FTC Act.

18.     The effect of the Proposed Transaction also may be substantially to lessen competition or tend to create a monopoly in the market for treatments for Pompe disease, which violates Section 7 of the Clayton Act.

19.     On December 11, 2023, by a 3-0 vote, the Commission found reason to believe that the Proposed Transaction (a) constitutes conduct that is reasonably capable of contributing significantly to Sanofi's continued monopoly power in treatments for Pompe disease in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2,  and thus also constitutes an unfair method of competition in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, and (b) would substantially lessen competition or tends to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.  On December 11, 2023, the Commission commenced an administrative adjudication proceeding to determine whether the Proposed Transaction is unlawful.  An administrative trial before an Administrative Law Judge, is scheduled to begin in 2024.  The ongoing administrative trial provides a forum for all parties to conduct discovery, followed by a merits trial with up to 210 hours of live testimony.  *See* 16 C.F.R. § 3.41.  The decision of the Administrative Law Judge is subject to appeal to the full Commission, which, in turn, is subject to judicial review by a United States Court of Appeals.

20.     In authorizing the filing of this Complaint, the Commission has determined that (1) it has reason to believe the Proposed Transaction would violate the Sherman Act, Clayton

Act and the FTC Act, and (2) an injunction of the Proposed Transaction pending the resolution of the Commission's administrative trial and any appeals will promote the public interest to minimize harm to customers, and to preserve the Commission's ability to grant an adequate remedy if it concludes, after the administrative trial, that the Proposed Transaction is unlawful.

21.     The Commission is entitled to preliminary relief in this Court because of its likelihood of success on the merits and the weight of the equities.  To succeed on the merits, the FTC must prove that the Proposed Transaction violates Section 2 of the Sherman Act, which makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations[,]" Section 5 of the FTC Act which prohibits "[u]nfair methods of competition in or affecting commerce[,]" or Section 7 of the Clayton Act, which prohibits transactions the effect of which "may be substantially to lessen competition, or tend to create a monopoly."  For the reasons described below, the FTC is likely to succeed in proving an antitrust violation, and the equities weigh strongly in favor of enforcing the antitrust laws.

## JURISDICTION AND VENUE

22.     This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and under 28 U.S.C. §§ 1331, 1337, and 1345.  This is a civil action arising under Acts of Congress protecting trade and commerce against restraints and monopolies and is brought by an agency of the United States authorized by an Act of Congress to bring this action.

23.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

Whenever the Commission has reason to believe

(1)     that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2)     that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond[.] . . .

24.     Defendants are, and at all relevant times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

25.     The FTC Act, 15 U.S.C. § 53(b), authorizes nationwide service of process, and personal jurisdiction exists where service is effected pursuant to federal statute.  Fed. R. Civ. P. 4(k)(1)(C).   Defendants are found, reside, and/or transact business in this state and district, and are subject to personal jurisdiction therein. Venue, therefore, is proper in this district under 28 U.S.C. § 1391(b) and 15 U.S.C. § 53(b).

26.     The Commission is charged with enforcing the Clayton Act. Section 7 of the Clayton Act prohibits acquisitions of assets where the effect "may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18.  Section 7 of the Clayton Act applies to "any line of commerce . . . in any section of the country."  *Id*.

27.     The Proposed Transaction constitutes a transaction subject to Section 7 of the Clayton Act, 15 U.S.C. § 18.

## THE PARTIES

28.     Plaintiff Federal Trade Commission is an agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41, *et seq.*, with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580.  The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

29.     Defendant Sanofi is a multinational pharmaceutical company headquartered in Paris, France.  Sanofi shares are traded on the Paris and New York stock exchanges, and the company in 2022 reported total net sales of about $47 billion.  Sanofi is the product of a series of mergers, including its 2011 acquisition of Defendant Genzyme, which brought with it a specialty care business focused on drug development for rare diseases.  Lysosomal Storage Disorders ("LSDs"), rare genetic conditions (such as Pompe disease) caused by enzyme deficiencies, are a cornerstone of Sanofi's rare disease franchise.  Currently, Sanofi has seven marketed therapies for LSDs, including its two medications for Pompe disease.  Sanofi's Pompe treatments generated global revenues of approximately $1.2 billion in 2022, approximately $500 million of which was generated in the United States.

30.     Defendant Genzyme is a Massachusetts corporation that is a wholly-owned subsidiary of Sanofi.  Headquartered in Cambridge, Massachusetts, Genzyme researches, develops, and markets pharmaceutical products in the United States.  Genzyme is a party to the License Agreement with Maze.

31.     Defendant Maze, founded in 2019, is a privately held biotechnology company headquartered in South San Francisco, California.  In addition to MZE001, Maze's portfolio includes target therapies in the neurological, cardio/renal, and ophthalmology disease areas.

11

## THE PROPOSED TRANSACTION

32.     On April 21, 2023, Sanofi and Maze entered into the Proposed Transaction, pursuant to which Sanofi proposes to acquire an exclusive global license to Maze's GYS1 products and related technology, including its lead clinical candidate MZE001 in development for Pompe disease.   In consideration of the licenses, Sanofi agreed to pay Maze $130 million in cash, make a $20 million equity investment in Maze when it completes its initial public offering, and pay Maze up to $605 million in future contingent development and commercialization milestone payments, as well as royalties on future sales of the licensed product(s).

## POMPE DISEASE

33.     Pompe disease, also called glycogen storage disorder type II, is a genetic disorder caused by mutations in the gene that codes for the production of the enzyme acid alpha-glucosidase ("GAA").  The GAA enzyme functions in the lysosomes, an organelle in muscle cells responsible for breaking down the complex sugar glycogen into the simpler sugar glucose, which is the primary energy source for most cells.  If the body cannot produce sufficient GAA enzyme, glycogen accumulates to toxic levels, resulting in damage and potentially cell death, particularly to smooth, cardiac, and skeletal muscle cells.

34.     Pompe disease is a rare disease, with a worldwide incidence of approximately 1 in 40,000 individuals.  Approximately one thousand patients are currently receiving treatment for Pompe disease in the United States.  Because the symptoms of Pompe disease overlap with many other neuromuscular conditions, patients often experience a long diagnostic odyssey before receiving a correct diagnosis.  Once a physician suspects their patient may have Pompe disease, the physician can diagnose the patient through GAA enzyme analysis and genetic testing.

However, because newborn genetic screening testing is becoming more common, the number of diagnosed patients with Pompe disease is expected to increase in the future.

35.     Pompe disease is a spectrum disease, with the severity of a patient's symptoms correlating to the degree of the impairment of the ability to produce the GAA enzyme.  There are two classifications for Pompe disease: infantile-onset Pompe disease ("IOPD") and late-onset Pompe disease ("LOPD").  IOPD patients typically exhibit symptoms upon birth or shortly thereafter.  These patients typically have a genetic variation that results in no GAA enzyme production, and they exhibit the most severe symptoms, including severe muscle weakness resulting in feeding problems and trouble breathing, an enlarged liver, and an enlarged heart due to cardiomyopathy.  IOPD is rapidly progressive, and patients typically do not survive beyond the age of two without treatment.  Any patient that begins to exhibit symptoms after one year of age is an LOPD patient.  LOPD patients typically produce some, but insufficient, GAA enzyme and usually present with progressive muscle weakness and respiratory deterioration due to weakening of the diaphragm muscle.  LOPD is a progressive disease, and patients' muscular abilities deteriorate over time, eventually resulting in death, typically through respiratory failure.

36.     Today, enzyme replacement therapy ("ERT") is the only treatment for Pompe disease.  ERT consists of bi-weekly IV infusions of a synthetic version of the human GAA enzyme that are administered in clinics under medical supervision to replace the GAA enzyme that a patient suffering from Pompe disease is unable to produce naturally.

37.     Sanofi's treatments were the only drugs approved to treat Pompe disease in the United States prior to September 28, 2023, when the FDA approved Amicus's IV ERT Pombiliti (cipaglucosidase alfa-atga) in combination with Opfolda (miglustat) oral capsules, as a second-line therapy for Pompe disease.  This two-component therapy is approved only for adults with

LOPD who are not improving on their current Sanofi ERT.  Amicus's product has little to no current market share. Sanofi's internal documents forecast that ███████████████

███████████████████████████████████████

38.     Maze's MZE001 GYS1 inhibitor aims to restore the balance of glycogen in a patient's cells by reducing the production of the glycogen substrate, rather than replacing or restoring the patient's GAA enzyme activity. GYS1 inhibitors are thus referred to as a substrate reduction therapy ("SRT").

## THE RELEVANT PRODUCT MARKET

39.     A relevant product market in which to analyze the Proposed Transaction is no broader than pharmaceutical treatments for Pompe disease ("Pompe Drugs").

40.     The only currently available treatments for Pompe disease are ERT drugs.  These drugs attack the root cause of Pompe disease by supplying synthetic versions of the human GAA enzyme that Pompe patients are unable to produce.

41.     There is no reasonably interchangeable substitute for Pompe Drugs.  The only other option available to Pompe disease patients is palliative care, such as respiratory support, occupational therapy, speech therapy, and physical therapy.  These non-pharmaceutical therapies are not reasonable functional substitutes for Pompe Drugs because they do not arrest or slow the progression of Pompe disease.

42.     Because there is no substitute for Pompe Drugs, there is no cross-elasticity of demand between them and any other therapy for Pompe disease.  Sanofi has repeatedly and profitably raised Lumizyme's and Nexviazyme's prices without patients switching to any other treatment and without considering the price for any other treatment.  The annual cost of treatment for either Lumizyme or Nexviazyme for a patient of average weight is over $750,000.

43.     Industry participants, including, but not limited to Defendants, recognize the existence of a separate and distinct market for Pompe Drugs in their regular course of business. Physicians and payors consider Sanofi's ERTs to be the only standard of care for Pompe disease. Moreover, when Defendants and other industry participants identify present and future participants in this market, they focus exclusively on drugs that are or will be FDA-approved specifically for Pompe disease.

## THE RELEVANT GEOGRAPHIC MARKET

44.     The relevant geographic area in which to analyze the effects of the Proposed Transaction on competition is the United States.

45.     The FDA regulates the production, research, development, testing, manufacture, marketing, and promotion of drug products in the United States.  A company must perform the necessary clinical trials and obtain FDA approval before marketing a drug in the United States. Accordingly, drugs sold outside the United States, but not approved for sale in the United States, do not provide viable alternatives for customers, even if the prices for Pompe Drugs currently available in the United States increase significantly.

46.     Defendants consider the United States to be a distinct market for Pompe Drugs in their regular course of business due to, among other reasons, its separate regulatory and approval process.

## MARKET STRUCTURE

47.     Sanofi's current market share in the United States market for Pompe Drugs, or any other relevant product market in which it sells Lumizyme or Nexviazyme, is approximately 100 percent.  Amicus's Pompe Drug has little to no current market share.

## MONOPOLIZATION & UNFAIR METHODS OF COMPETITION

### A.  Sanofi is a Monopolist in Pompe Drugs

48.     Sanofi possesses monopoly power in the United States market for Pompe Drugs, as evidenced by supracompetitive prices and restricted output.

49.     Sanofi's share of the market for Pompe Drugs in the United States is currently approximately 100 percent, ███████████████████████████ ████████████████████████████████████████ ██████████████████████████

50.     This market has high entry barriers, including, among other things, the substantial cost and time required to discover, develop, and gain FDA approval for new Pompe Drugs. Marketed products are also protected by patents and other proprietary intellectual property.

### i.  Direct Evidence of Sanofi's Monopoly Power

51.     Sanofi has repeatedly and profitably raised Lumizyme's and Nexviazyme's prices ███████████████████████████ and without inducing patients to switch to any other treatment or payers to curtail coverage for the medications.  Following fifteen years of price increases, the annual cost of treatment for either Lumizyme or Nexviazyme for a patient of average weight is over $750,000.  The fact that Sanofi does not ████████████████ ████████████████████████████████████████ ████████████████████████████ is additional direct evidence that Sanofi is able to charge supracompetitive prices without fear of competition from alternative treatments.

52.     The extraordinarily high profit margins Sanofi realizes on its Pompe Drugs are additional direct evidence of Sanofi's monopoly power.  In 2022, Sanofi enjoyed gross margins

of over ██ percent, and net operating margins of over ██ percent, on sales of Lumizyme and Nexviazyme in the United States.

53.     Although Sanofi was aware that Amicus Therapeutics' two-component ERT for Pompe disease was likely to receive FDA approval and launch in 2023, Sanofi has not reduced its pricing for Lumizyme and Nexviazyme in anticipation of the launch of Amicus's Pompe Drug.  Because Amicus Therapeutics' two-component ERT was only approved as a second-line therapy (for patients not improving on Sanofi's therapies), Sanofi has little to no incentive to decrease its list prices or offer significant discounts or rebates on Lumizyme and Nexviazyme, which remain the only FDA-approved treatments for newly diagnosed patients starting treatment for Pompe disease.

**ii.     Indirect Evidence of Sanofi's Monopoly Power**

54.     Sanofi's current market share in this relevant market, or any other relevant market in which it sells Lumizyme or Nexviazyme in the United States, is approximately 100 percent.

55.     Sanofi's high market share is protected by significant barriers to entry and the lack of competitive Pompe Drug launches on the horizon.  Other than Amicus' second-line treatment, ███████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

**B.  MZE001 Constitutes a Nascent Threat to Sanofi's Monopoly**

56.  Sanofi's proposed acquisition of an exclusive license to MZE001 would eliminate a nascent threat to Sanofi's monopoly for FDA-approved treatments for Pompe Drugs in the United States.

**i.   MZE001 Targets the Same Indication as Sanofi's Nexviazyme**

57.  The target product profile for MZE001 largely overlaps with the product profile for Sanofi's Lumizyme and Nexviazyme.  If Maze or another pharmaceutical partner gained FDA approval for MZE001, ███████████████████████████████████████ ████████████████████████████ Nexviazyme is currently approved as a first-line therapy for LOPD patients one year of age and older.

58.  There is significant expected demand for an oral Pompe disease monotherapy with similar safety and efficacy to ERTs, because it would significantly reduce patients' treatment burden.  ERTs typically require patients to visit an infusion center or physician's office every two weeks for IV infusions lasting up to five hours.  In contrast, a patient can take an oral medication like MZE001 at home without the need for supervision by a medical professional.

59.  Sanofi's commercial team responsible for Pompe disease recognizes ███
████████████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████

60.  After conducting market research on how physicians would view MZE001, Sanofi's Director of New Product Planning for Rare Diseases concluded ████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████

61.     Likewise, internal Maze documents discussed that MZE001 could ████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

**ii.     Maze's Preclinical and Clinical Studies Demonstrate MZE001's Threat to Impact Sanofi's Monopoly**

62.     MZE001 is the lead program in Maze's research and development pipeline.  Prior to negotiations with Sanofi, Maze took several concrete steps toward gaining FDA approval for the drug.  Maze ██████████████████████████████████████, successfully completing Phase 1 clinical trials with positive results.  Maze ██████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████     In a February 2023 press release announcing positive data from its Phase 1 clinical trials for MZE001, Maze also announced it was poised to begin Phase 2 clinical trials for MZE001 later in 2023.  ███████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████

63.     The results of preclinical and clinical studies for MZE001 showcase the drug's promise.  In February 2022, Maze published results from preclinical studies which demonstrated,

among other conclusions, that MZE001 potently and selectively inhibited glycogen synthesis in human and animal *in vitro* assays, including in cells from healthy volunteers and patients with Pompe disease, as well as *in vivo* mouse and canine studies, and that MZE001's GYS1 inhibition was generally well tolerated.

64.     In February 2023, Maze announced positive results from the MZE001 Phase 1 clinical trial in 112 healthy volunteers.  Maze's Chief Medical Officer ("CMO") stated that the clinical data "showcases [MZE001's] ability to potently and selectively inhibit GYS1, the enzyme that controls glycogen production, a key driver of Pompe disease[.]"  He further stated that the Phase 1 data "mirror [Maze's] preclinical findings and provide proof of mechanism for MZE001."  Maze's CMO also contrasted the results against the current standard of care – Sanofi's ERTs.  "While enzyme replacement therapy has brought significant benefit to patients, glycogen accumulation in muscle continues to allow the disease to progress, specifically impacting ambulation and respiratory function.  By leveraging large sources of matched genetic and clinical data with our Compass platform, we were able to design MZE001 to address longstanding questions around safety and efficacy that previously precluded development of a substrate reduction therapy."

**iii.     Sanofi Internally Assessed MZE001 as a Threat to Its Monopoly**

65.     Because of MZE001's promise as a first-to-launch oral SRT for Pompe disease, Sanofi employees repeatedly recognized the threat MZE001 posed to Sanofi's monopoly.



66.     Consistent with these conclusions, Sanofi's internal forecasts evaluating the

Proposed Transaction projected

67.

## C. Absence of Procompetitive Justifications

68.     Defendant Sanofi cannot demonstrate procompetitive justifications for the

Proposed Transaction that increase competition on the merits and produce benefits to

competition.  Any proffered justifications are pretextual and do not outweigh the anticompetitive

effect of Sanofi removing a threat to its monopoly. Any purported benefits could be

accomplished through other means without eliminating competition between Sanofi's Pompe

drugs and MZE001.

## SUBSTANTIAL LESSENING OF COMPETITON

69.     The Proposed Transaction would eliminate all ongoing competition between Maze and Sanofi for Pompe Drugs, depriving patients, doctors, and payers of the benefits of competition, including greater innovation.

70.     If Sanofi did not acquire MZE001, MZE001 would continue development as part of Maze, an independent player already engaged in the business of developing a Pompe Drug and working diligently to commercialize it.

71.     The Proposed Transaction could delay MZE001's FDA approval timeline.  Maze, either independently or partnered with another firm, has strong financial incentives to progress MZE001 through the clinical trial process quickly, because only upon receiving FDA approval will MZE001 begin to generate revenue in the relevant market.  ███████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

████████

72.     The Proposed Transaction may substantially lessen competition, further harming patients, physicians, and payors by eliminating close competition between Maze and Sanofi.

73.     Pharmaceutical companies compete not only on price, but also to develop better treatments to meet unmet needs.  In a competitive market, pharmaceutical companies are driven by the incentive to research and develop innovative treatments. When multiple companies strive to develop new drugs, that innovation race produces tangible benefits for consumers.  An awareness of the innovation efforts of other firms—information that is often publicly available

for drugs in the clinical development pipeline—pushes the pace car of research and development for competing firms.

74.     At present, Maze and Sanofi are ███████████████████████████████████ ████████████████    Maze's preclinical data and successful Phase 1 clinical trial has pressured Sanofi ████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

75.     In February 2022, Maze announced that it would be initiating first-in-human trials for MZE001.  Sanofi then realized ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████

██████████████████

76.     If consummated, the Proposed Transaction would eliminate this close ongoing competition. The elimination of competition would dramatically reduce Sanofi's financial incentives to continue ████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████

77.     Defendants cannot demonstrate that entry or expansion of products in the market for Pompe Drugs in the United States would be timely, likely, or sufficient in magnitude, character, and scope to deter or counteract the anticompetitive effects of the Proposed Transaction.

78.     Successful entry into the United States Pompe Drug market would be difficult, time consuming, and costly, requiring specialized know-how, advanced technology, and specialized equipment and facilities.  Before a prescription pharmaceutical product may be sold in the United States, it must be approved by the FDA as safe and effective for its intended

indication.  The approval process is lengthy and costly.  Development of a drug indicated for

Pompe disease can take several years and can cost hundreds of millions of dollars.

79.     Defendants cannot demonstrate merger-specific, verifiable, and procompetitive

efficiencies likely to pass through to consumers of sufficient magnitude and likelihood to rebut

the evidence of the Proposed Transaction's anticompetitive effects.

## **VIOLATIONS**

### **COUNT I – MONOPOLIZATION & UNFAIR METHODS OF COMPETITION**

80.     The allegations of Paragraphs 1 through 79 are incorporated by reference.

81.     Defendant Sanofi has, and at all relevant times had, monopoly power in the

relevant market for Pompe Drugs, as well as in any other relevant market in which it sells

Lumizyme or Nexviazyme.

82.     Maze's MZE001 is a nascent threat to Sanofi's monopoly power.

83.     The Proposed Transaction, if consummated, would eliminate the nascent

competitive threat that MZE001 poses to Sanofi's monopoly power and, therefore, constitutes

anticompetitive conduct reasonably capable of contributing significantly to Sanofi's continued

monopoly power.

84.     Sanofi lacks any legitimate business justification for its anticompetitive conduct,

and any claimed justification is pretextual and does not outweigh the anticompetitive effect of

the Proposed Transaction.

85.     The Proposed Transaction constitutes monopolization in violation of Section 2 of

the Sherman Act, 15 U.S.C. § 2, and Defendants' acts and practices are anticompetitive in nature

and tendency and thus constitute unfair methods of competition in violation of Section 5(a) of

the FTC Act, as amended, 15 U.S.C. § 45(a).

## COUNT II – ILLEGAL ACQUISITION

86.     The allegations of Paragraphs 1 through 79 above are incorporated by reference.

87.     The Proposed Transaction would eliminate ongoing competition between Defendants Sanofi and Maze in the relevant market for Pompe Drugs.  Although other firms also are engaged in research and development for Pompe Drugs, Maze and Sanofi are particularly close competitors as ███████████████████████████████████████████ ██████████████████  As a result, patients and physicians will lose the benefit of the competitive process by which Sanofi and Maze are ███████████████████████████ ███████████████████████████  Defendants cannot show that any cognizable efficiencies are of a character and magnitude such that the Proposed Transaction is not likely to be anticompetitive.

88.     The Proposed Transaction, if consummated, may substantially lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## LIKELIHOOD OF SUCCESS ON THE MERITS,  BALANCE OF EQUITIES, AND NEED FOR RELIEF

89.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that a Proposed Transaction is unlawful, to seek preliminary injunctive relief to prevent consummation of the acquisition until the Commission has had an opportunity to adjudicate the acquisition's legality in an administrative trial.  In deciding whether to grant relief, the Court must assess the likelihood of the Commission's ultimate success on the merits and weigh the public equities.  The principal public equity weighing in favor of issuance of preliminary injunctive relief is the public interest in effective enforcement of the antitrust

laws.   Private equities affecting only Defendants' interests do not suffice to defeat a preliminary injunction.

90.     The Commission will demonstrate a sufficient likelihood of success in proving that the effect of the Proposed Transaction may be substantially to lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, or Section 5 of the FTC Act, 15 U.S.C § 45.   In particular, the Commission will meet its burden in demonstrating, among other things, that:

  a.   The Proposed Transaction would have anticompetitive effects in the United States, in a relevant product market for Pompe Drugs;

  b.   Substantial and effective entry or expansion is difficult and would not be timely, likely, or sufficient to offset the anticompetitive effects of the Proposed Transaction; and

  c.   Any efficiencies and procompetitive benefits asserted by Defendants do not justify the Proposed Transaction.

91.     Preliminary relief is warranted and necessary.   Should the Commission rule after the full administrative trial that the Proposed Transaction is unlawful, reestablishing the status quo ante if the Proposed Transaction has already consummated in the absence of preliminary relief would be extremely difficult.   Moreover, in the absence of relief from this Court, substantial harm to competition would likely occur in the interim, even if suitable divestiture remedies were obtained later.

92.     Accordingly, the equitable relief requested here is in the public interest. Wherefore, the Commission respectfully requests that:

a.  Defendants be preliminarily enjoined from taking any further steps to consummate the Proposed Transaction and any related transactions, stock assets, or acquisition of any other interests of one another either directly or indirectly and be preliminarily enjoined from carrying out any other agreement, understanding, or plan by which Sanofi would acquire control over Maze's GYS1 products and related technology;

b.  Retain jurisdiction and maintain the status quo until the conclusion of the administrative adjudication that the Commission has initiated; and

c.  Award such other and further relief as the Court may determine is appropriate, just, and proper.

Dated:  December 11, 2023

Respectfully Submitted,


NATHAN SODERSTROM
Acting Deputy Director
Bureau of Competition
Federal Trade Commission

SHAOUL SUSSMAN
Associate Director for Litigation
Federal Trade Commission

*Attorneys*
*Federal Trade Commission*
*Bureau of Competition*

/s/ James H. Weingarten
JAMES H. WEINGARTEN
Deputy Chief Trial Counsel
Bureau of Competition
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
Telephone: (202) 326-3570
Email: jweingarten@ftc.gov

STEPHEN MOHR
Assistant Director

JAMES WEISS
Deputy Assistant Director

JAMES E. SOUTHWORTH
KEITH HOLLERAN
JOSEPH R. NEELY
ELENA PONTE
R. TYLER SANBORN
HILLA SHIMSHONI

*Counsel for Plaintiff Federal Trade*
*Commission*

## CERTIFICATE OF SERVICE

I hereby certify that on the December 11, 2023, I served the foregoing on the

following counsel via electronic mail:

Michael McFalls
Jonathan Klarfeld
Ropes & Gray LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
Michael.McFalls@ropesgray.com
Jonathan.Klarfeld@ropesgray.com

*Counsel for Defendants Sanofi and Genzyme Corporation*

Stephen Weissman
Michael Perry
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306
sweissman@gibsondunn.com
mjperry@gibsondunn.com


*Counsel for Defendant Maze Therapeutics, Inc.*

/s/ James H. Weingarten
James H. Weingarten
*Counsel for Plaintiff Federal Trade
Commission*
